DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Willie J. Copeland, ) | |
| ) | CASE NO. 3:02CV7240 |
| Plaintiff(s), ) | |
| ) | |
| v. ) | MEMORANDUM OPINION |
| ) | (Resolving Doc. No. 55.) |
| IBEW Local No. 8, ) | |
| ) | |
| Defendant(s). ) | |
| ) | |

## I. INTRODUCTION

Plaintiff Willie J. Copeland, an African-American, alleges that Defendant IBEW Local No. 8 (IBEW) discriminated against him by failing to process his race based grievances and by unfairly representing him in the collective bargaining process. Before the Court is IBEW's Motion for Summary Judgment (Doc. No. 55), which has been fully briefed (Doc. Nos. 63, 64). IBEW has also moved for attorney fees. (Doc. No. 55.) Because Copeland's purported grievances did not assert violations of the collective bargaining agreement and because he has not presented any evidence of unfair representation in the collective bargaining process, the Motion is GRANTED. IBEW's Motion for Attorney Fees, however, is DENIED because Copeland's claim was not groundless.

## II. BACKGROUND

Plaintiff Willie J. Copeland, an African-American, is a member of Defendant IBEW, Local No. 8, an electrical workers union. IBEW entered into a collective bargaining agreement (the CBA) with the Toledo Electrical Contractors Association, Inc., which covered the period from May 24, 1999,

(3:02CV7240)

through May 26, 2002. Article II, Section 2.02 of the CBA allows employers to freely transfer employees from job to job within Local No. 8's geographical jurisdiction.

> The Union understands the Employer is responsible to perform the work required by the owner. The Employer shall, therefore, have no restrictions except those specifically provided for in the [CBA] in planning, directing and controlling the operation of all his work, in deciding the number and kind of employees to properly perform the work, in hiring and laying off employees, *in transferring employees from job to job within the Local Union's geographical jurisdiction*, in determining the need and number as well as the person who will act as Foreman, in requiring all employees to observe the Employer's and/or owner's rules and regulations not inconsistent with [the CBA], in requiring all employees to observe all safety regulations, and in discharging employees for proper cause.

(Doc. No. 58, p. D0227 (emphasis added).) The CBA, however, does not contain a non-discrimination clause.

### A. The Retzke/Snyder Grievance

In July of 1999, Copeland was working on a project at St. Vincent Mercy Medical Center in Toledo, Ohio for Retzke/Snyder Electrical Contractors, Inc. This project provided 50 hours of work per week, forty hours of regular time and ten hours of overtime. On Friday, July 30, 1999, Copeland's supervisor Mike Laney instructed him to report to the Retzke/Snyder project at the St. Martin de Porres Church on Monday, August 2, 1999. Laney indicated to Copeland that a "Black" was needed at the St. Martin project, and Copeland was to fill that role. The pastor at St. Martin had requested that Retzke/Snyder use African-Americans on the project, and Retzke/Snyder had decided to transfer Copeland. The St. Martin project provided only forty hours of work per week. Copeland, therefore, protested the loss of overtime and requested that Retzke/Snyder hire another African-American to fill

2

(3:02CV7240)

the position. Laney, however, insisted that Copeland report to the St. Martin project. On Monday, August 2, 1999, Copeland reported to the St. Vincent project as normal. He was greeted by John Retzke who asked him if he was going to report to the St. Martin project. Copeland indicated that he would not report to the St. Martin project, so Retzke handed him a photocopy of his referral with the words "Voluntary Quit" typed on it.

On August 5, 1999, Copeland attempted to file a grievance against Retzke/Snyder. Copeland, however, could not cite a provision of the CBA that had been violated. Jim Koslowski, the IBEW business agent with whom Copeland attempted to file the grievance, consequently, refused to accept the grievance. Copeland then filed charges with the Ohio Civil Rights Commission and the EEOC against both Retzke/Snyder and IBEW. Copeland settled his claim against Retzke/Snyder for $5,500. On April 2, 2001, the EEOC issued a determination finding that IBEW had discriminated against Copeland by acquiescing and failing to oppose Retzke/Snyder's alleged discrimination against Copeland.

After the EEOC's determination, IBEW sought to prosecute Copeland's grievance as a violation of Article II, Section 2.02 of the CBA. Copeland, however, refused to cooperate in this process. Nonetheless, IBEW pursued the grievance to the highest level of appeal under the CBA. On February 12, 2002, the Council on Industrial Relations denied the grievance because there was no violation of the CBA. (Doc. No. 58, p. D0219.)

### B. The Journeyman In Training Grievance

Article IV of the CBA establishes the referral procedure, the procedure by which applicants

3

(3:02CV7240)

are referred for employment. It creates four groups of employees: Group 1 consists of applicants who have at least four years of experience in the trade, reside in the geographic area, have passed an examination, and who have been employed in the geographic area for at least one year in the last four years; Group 2 consists of applicants who have at least four years of experience in the trade and have passed an examination; Group 3 consists of applicants who have at least two years of experience, reside in the geographic area, and have been employed for at least six months in the last three years; and Group 4 consists of applicants who have worked at the trade for more than one year. (Doc. No. 58, p. D0253-54.) The union maintains an "Out of Work List" which lists applicants in their appropriate group in chronological order based on the dates on which they register their availability for employment. (Doc. No. 58, p. D0256.) When an employers need employees covered by the CBA, they notify IBEW's Business Manager of the number of applicants they will need, and the Business Manager then refers applicants to the employer from the Out of Work List in group and chronological order (thus, the Group 1 applicant who has been on the list the longest would be the first referred and the Group 4 applicant who has most recently been placed on the list would be the last). (Doc. No. 58, D0256-57.)

IBEW also operates the Comet Program, under which Journeyman In Training (JIT's), non-union workers who require further training, are organized into the union and assigned to work. JIT's are paid at 80% of scale. They are not placed on the Out of Work List but rather assigned to positions by the union's Business Manager. Copeland contends that no African-Americans have ever been organized into the JIT program.

4

(3:02CV7240)

In 2000, Copeland was working for Brint-Electric on a project at the Lucas County Juvenile Detention Center. In early-May of 2000, Brint hired JIT's who were less qualified than Copeland, and on October 23, 2000, Brint transferred eight other employees to the job site. On October 27, 2000, Brint laid off Copeland. Subsequently, Copeland attempted to file a grievance (the JIT grievance) against Brint. He did not cite a provision of the CBA that was violated but rather stated that the grievance was "based on discrimination." (Doc. No. 58, p. D0098.) Initially, IBEW pursued this grievance as a violation of Article II, Section 2.02. At the grievance hearing, Copeland indicated that he did not feel it was an Article II, Section 2.02 grievance but that his grievance pertained in more general terms to the entire CBA, which he felt led to discriminatory practices. (Doc. No. 58, p.0110-11.) Consequently, the grievance committee denied the grievance. (Doc. No. 58, p. 0111.)

The matter was then referred to the Referral Appeals Committee, to determine if the referral procedure outlined in Article IV of the CBA had been violated. The Appeals Committee determined that JIT's are not covered by the CBA, and, therefore, are not subject to the terms of Article IV. (Doc. No. 58, p. D0053.) Consequently, the Appeals Committee found no violation of the CBA. (Doc. No. 58, p. D0053.)

### C. Procedural History

Copeland filed suit in this action on May 9, 2002. On February 23, 2005, IBEW filed its Motion for Summary Judgment and Motion for Attorney Fees (Doc. No. 55). This Motion has been fully briefed. (See Doc. Nos. 63, 64.)

### III. LEGAL STANDARD

5

(3:02CV7240)

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 . When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). However, the adverse party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The Rule requires the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. See Lujan v. National Wildlife Federation, 497 U.S. 871, 888-89 (1990). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts . . . earlier deposition testimony." Reid v. Sears Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986) (citing Biechell v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir. 1984)); but see Baer v. Chase, 392 F.3d 609, 623-26 (3d Cir. 2004) (noting that a so-called "sham" affidavit need not be disregarded if there is "independent evidence in the record to bolster [the] otherwise questionable affidavit"). Further, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for

6

(3:02CV7240)

the plaintiff.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1477 (6th Cir. 1989) (quoting Anderson v. Liberty Lobby, 477 U.S. at 252).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, 477 U.S. at 250. Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. See also Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 578 (6th Cir. 2003) ("[t]he conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment").

## IV. LAW AND ANALYSIS

### A. Standing

IBEW first argues that Copeland lacks standing to bring this suit because subsequent actions have rendered the dispute moot. Federal courts only have the power to decide cases where it would make a difference to the legal interests of the parties if the relief sought were granted. United States v. City of Detroit, 401 F.3d 448, 450-51 (6th Cir. 2005).

> "A federal court has no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue." Cleveland Branch, N.A.A.C.P. v. City of Parma, 263 F.3d 513, 530 (6th Cir.2001) (citing Church of Scientology v. United States, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)). "A case becomes moot 'when the issues presented are no longer live or parties lack a legally cognizable interest in the outcome.'" Id. (quoting County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)).

(3:02CV7240)

> Mootness generally depends on "whether the relief sought would, if granted, make a difference to the legal interests of the parties . . . ." McPherson v. Michigan High School Athletic Ass'n, Inc., 119 F.3d 453, 458 (6th Cir.1997) (en banc) (internal quotation marks and citation omitted). "The mootness inquiry must be made at every stage of a case; thus, if a case becomes moot during an appeal, the judgment below must be vacated and the case remanded with instructions to dismiss." Id.

City of Detroit, 401 F.3d at 450-51. Even if a plaintiff's claims for injunctive or declaratory relief have been mooted by subsequent actions of a defendant, "the existence of a damages claim ensures that [the] dispute [remains] a live one." Blau v. Fort Thomas Pub. Sch. Dist., 401 F.3d 381, 387-88 (6th Cir. 2005) (citing cases).

Here, IBEW argues that this action has been mooted because it aggressively pursued Copeland's grievance rights and because Copeland settled his case with Retzke/Snyder for damages and attorneys fees. Copeland, however, seeks damages allegedly arising from IBEW's failure to pursue race based grievances and unfair representation in the collective bargaining process. While Copeland has settled his dispute with Retzke/Snyder, such a settlement does not require the conclusion that Copeland has been remedied for any alleged failure by IBEW. Furthermore, Copeland disputes whether IBEW fully pursued his race based grievances. Thus, a dispute remains regarding whether IBEW breached the duties it owed Copeland. The Court, therefore, concludes that this dispute is not moot.

### B. Failure to Join an Indispensable Party

IBEW next argues that this action should be dismissed because Copeland failed to join an indispensable party, namely Retzke/Snyder. "A person . . . shall be joined as a party in the action if []

8

(3:02CV7240)

in the person's absence complete relief cannot be accorded among those already parties . . . ." Fed. R. Civ. P. 19(a)(1). Rule 19(a)(1) does not apply where the Court can grant all of the relief that is sought. Salary Policy Employee Panel v. Tenn. Valley Auth., 149 F. 3d 485, 493, fn. 13, (6th Cir. 1998). Here, IBEW argues that Retzke/Snyder is a necessary party only under Rule 19(a)(1). IBEW, however, does not argue that the Court cannot grant all of the relief which Copeland seeks without Retzke/Snyder; it merely asserts that its defenses will be prejudiced by Retzke/Snyder's absence. Retzke/Snyder, therefore, is not a necessary party under Rule 19(a)(1).

Furthermore, even if prejudice were sufficient to state a basis for relief under Rule 19(a)(1), IBEW's argument that it is prejudiced by Retzke/Snyder's absence from this suit would still fail. IBEW argues that, as a result of Copeland's settlement with Retzke/Snyder, it is irreparably prejudiced by Retzke/Snyder's absence from this litigation because it will be unable to litigate issues concerning whether Retzke/Snyder actually unlawfully discriminated against Copeland. Retzke/Snyder's absence from this litigation, however, does not prevent IBEW from litigating the issue of whether it actually unlawfully discriminated against Copeland. Contrary to IBEW's assertion, the settlement of a dispute does not prevent a court from later adjudicating the merits of that dispute if it is relevant to some live controversy. Furthermore, IBEW can obtain evidence relating to this issue from Retzke/Snyder through the use of subpoenas. Thus, IBEW is not prejudiced by Copeland's settlement with Retzke/Snyder, and Retzke/Snyder is not an indispensable party.

### C. Statute of Limitations

IBEW argues that this Court should not consider Copeland's § 1981 claims because they are

9

(3:02CV7240)

barred by the statute of limitations. On December 1, 1990, Congress passed 28 U.S.C. § 1658, which establishes a general statute of limitations to all federal statutes enacted after that date. Anthony v. BTR Auto. Sealing Sys., Inc., 339 F.3d 506, 512 (6th Cir. 2003). Section 1658 provides that "[e]xcept as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of enactment of this section may not be commenced later than 4 years after the cause of action accrues." In 1991, Congress amended § 1981 through the Civil Rights Act of 1991. Consequently, § 1658's four-year statute of limitations applies to § 1981 claims that arise under the portion of the statute enacted by the Civil Rights Act of 1991. Anthony, 339 F.3d at 514. Other § 1981 claims, however, remain subject to the borrowed state statute of limitations. Id.

In Patterson v. McLean Credit Union, 491 U.S. 164, 177-78, (1989), the Supreme Court held that § 1981 did not proscribe either discriminatory termination or other discriminatory actions occurring after the formation of the contract. See Anthony, 339 F.3d at 512. The Civil Rights Act of 1991 amended § 1981 by adding subsection (b) which defined "make and enforce" contracts to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Thus, the Civil Rights Act of 1991 expanded § 1981 to allow claims alleging post-contract formation discriminatory practices. According to Anthony, therefore, § 1981 claims alleging post-contract formation discriminatory practices are subject to § 1658's four-year statute of limitations.

Here, Copeland alleges that IBEW discriminated against him by failing to process his race related grievances; in other words, he alleges post-contract formation discriminatory practices. The

10

(3:02CV7240)

four-year statute of limitations from § 1658, therefore, applies to Copeland's claims. Copeland filed his Complaint in this matter on May 9, 2002. Thus, for events to remain actionable, they must have occurred on or after May 9, 1998. Copeland attempted to file his Retzke/Snyder grievance on August 5, 1999, and his JIT grievance on May 5, 2001, but IBEW declined to pursue either grievance. Thus, IBEW's allegedly injurious conduct occurred after May 9, 1998. Consequently, Copeland's § 1981 claims are not barred by the statute of limitations.

### D. Failure to Exhaust Administrative Remedies

IBEW further argues that the Court should not consider Copeland's complaints regarding IBEW's failure to process the JIT grievance because Copeland did not file a charge with the EEOC on that issue. "It is well settled that federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge." Strouss v. Mich. Dep't of Corr., 250 F.336, 342 (6th Cir. 2001) (citing Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 254 (6th Cir.1998)). Thus, "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." Davis v. Sodexho, Cumberland Coll. Cafeteria, 157 F.3d 460, 463 (6th Cir.1998), quoted in Wiegel v. Baptist Hosp. of E. Tenn., 302 F.3d 367, 380 (6th Cir. 2002).

Here, Copeland filed his only charge with the Ohio Civil Rights Commission and EEOC on November 15, 1999, and the EEOC received the charge on December 7, 1999. In the charge, Copeland alleged that he was denied union representation on August 2, 1999, and that he was

11

(3:02CV7240)

discriminated against because the company violated the collective bargaining agreement and IBEW "permitted the breach to go unrepaired." Thus, Copeland's Retzke/Snyder charge asserted a complaint regarding the failure to process a grievance. Copeland's JIT grievance, however, dealt more with concerns regarding the referral procedure and the purported discriminatory impact of the CBA, not the failure to process a grievance. Consequently, the facts related to the Retzke/Snyder charge would not have prompted the EEOC to investigate the JIT grievance. The Court, therefore, concludes that Copeland failed to exhaust his administrative remedies with respect to the JIT grievance. This determination, however, does not resolve the issues surrounding the JIT grievance because Copeland also asserts a violation of § 1981, which does not require the exhaustion of Title VII administrative remedies. See Patterson, 491 U.S. at 181; Young v. Sabbatine, No. 99-6336, 2000 WL 1888672, *3-4 (6th Cir. Dec. 19, 2000).

### E. Substantive Defenses

IBEW also contends that it is entitled to summary judgment on the merits of Copeland's claims. Under § 703(c)(1) of Title VII, it is an unlawful employment practice for a union "to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race[.]" 42 U.S.C. § 2000e-2(c)(1). Likewise, § 703(c)(3) renders it an unlawful employment practice for a union "to cause or attempt to cause an employer to discriminate against an individual in violation of this section." 42 U.S.C. § 2000e-2(c)(3). Similarly, 42 U.S.C. § 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts," and "make and enforce contracts" is defined as "the making, performance,

12

(3:02CV7240)

modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," 42 U.S.C. § 1981(b). Courts analyze § 1981 claims under the same standards employed to analyze Title VII racial discrimination claims. Johnson v. Univ. of Cincinnati, 215 F.3d 561, 573 n. 5 (6th Cir.2000), quoted in Noble v. Brinker Int'l, Inc., 391 F.3d 715, 720 (6th Cir. 2004). Similarly, Ohio courts have held that the standards for determining whether a violation of Title VII has occurred apply for determining whether Ohio Rev. Code § 4112.02 has been violated. Noble, 291 F.3d at 720 (citing Williams v. Ford Motor Co., 187 F.3d 533, 538 (6th Cir.1999)).

Here, Copeland "claims racial discrimination *based upon* unfair representation." (Doc. No. 63, p. 20.) After parsing Copeland's Opposition to the Motion for Summary Judgment (Doc. No. 63), the Court has discerned two methods of alleged unfair representation which Copeland argues resulted in racial discrimination: (1) IBEW's failure to process race based grievances and discouragement of the filing of such grievances and (2) IBEW's failure to protect the interests of its minority members in the collective bargaining process.

### 1. Failure to process race based grievances

Copeland first argues that IBEW discriminated against him by failing to process his race based grievances. "[A] collective bargaining agent [cannot], without violating Title VII and § 1981, follow a policy of refusing to file *grievable* racial discrimination claims however strong they might be and however sure the agent was that the employer was discriminating against blacks." Goodman v. Lukens Steel Co., 482 U.S. 656, 668-69 (1987) (emphasis added). To fulfill its duty of fair representation, a

13

(3:02CV7240)

union must enforce the provisions of the collective bargaining agreement in a non-discriminatory manner. Farmer v. ARA Serv., Inc., 660 F.2d 1096, 1103 (6th Cir. 1981).  A union, however, does not have an affirmative duty to investigate and rectify employer discrimination. Id. at 688 (Powell, J., dissenting); EEOC v. Pipefitters Ass'n Local Union 597, 334 F.3d 656, 660 (7th Cir. 2003). Furthermore, it is "a tenuous theory of discrimination" to assert that a union engages in discriminatory conduct by deciding that it does not wish to address the class of complaints that consists of complaints about discrimination. Pipefitters, 334 F.3d at 661-62.

In Goodman, the Court held that a union violated Title VII when it failed to process the grievances of its African-American members alleging racial discrimination. 482 U.S. at 668-69.  There, the collective bargaining agreement contained an express non-discrimination clause, but the union refused to file racial discrimination and racial harassment grievances, despite evidence that the employer was discriminating against African-Americans. Id. at 666.  In other words, "the Unions . . . categorized racial grievances as unworthy of pursuit and, while pursuing thousands of other legitimate grievances, ignored racial discrimination claims on behalf of blacks, knowing that the employer was discriminating *in violation of the contract*." Id. at 668-69 (emphasis added). This conduct amounted to "far more than mere passivity;" the unions "intentionally discriminated against blacks seeking a remedy for disparate treatment based on their race and violated both Title VII and § 1981." Id. at 666, 669.

Where a collective bargaining agreement does not contain a non-discrimination provision, however, a union's refusal to pursue discrimination claims does not violate the collective bargaining agreement. Thompson v. United Transp. Union, No. 99-2288-JWL, 2000 WL 1929963, *10 (D.

14

(3:02CV7240)

Kan. Dec. 19, 2000) (citing Goodman, 482 U.S. at 668-69); see also Greene v. Pomona Unified Sch. Dist., 38 Cal. Rptr.2d 770, 774-75 (Cal. Ct. App. 1995). In Thompson, the court held that the plaintiffs discrimination claims against the union based on the union's failure to file sexual discrimination and sexual harassment grievances failed because neither sexual discrimination nor sexual harassment were grievable offenses under the collective bargaining agreement. 2000 WL 1929963, at * 19. Likewise, in Greene, the court held that the union did not violate Title VII by failing to bring the plaintiffs' discrimination grievances because those grievances were not included in the collective bargaining agreement. 38 Cal. Rptr. 2d at 774-75.

Here, Copeland argues that IBEW discriminated against him by failing to bring his discrimination grievances; specifically his allegation that employers discriminated against him by terminating him on the basis of race. The CBA here, however, like the collective bargaining agreements in Thompson and Greene, does not contain a non-discrimination clause. Furthermore, Copeland did not contend that the terminations violated a provision of the CBA. Neither Copeland's Retzke/Snyder grievance nor the JIT grievance assert that an article of the CBA was violated. Indeed, the JIT grievance states that the question asking what article of the CBA was violated is not applicable because "this is based on discrimination." Thus, unlike Goodman, IBEW was not refusing to process grievable racial discrimination claims. IBEW's refusal to pursue discrimination grievances, therefore, does not violate either Title VII or § 1981.

**2. Failure to protect the interests of minority members during collective bargaining**

Copeland contends that IBEW discriminated against him by failing to represent him and other

15

(3:02CV7240)

minorities adequately in the collective bargaining process. To fulfill its duty of fair representation, a union "must have . . . fairly represented all segments of the bargaining unit during the negotiation of each collective bargaining agreement." Farmer, 660 F.2d at 1103 (citing Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 564 (1976)). "[A] union's breach of the duty of fair representation also subjects it to liability under Title VII if the breach can be shown to be because of the complainant's race, color, religion, sex, or national origin." Id. at 1104. Thus a union's role in negotiating a collective bargaining agreement can render it liable under Title VII when "the contractual provisions [are] discriminatory in operation or perpetuate[] the effects of past discrimination." Id. (collecting cases).

In Farmer, the court held that the union violated its duty of fair representation and Title VII by negotiating a collective bargaining agreement that created and perpetuated sexually discriminatory effects of the employment relationship. Id. at 1104. There, the collective bargaining agreement resulted in transfers between job classifications which perpetuated the employer's discriminatory practices; relegated the majority of female employees to fewer-hour, lower-paying positions; compensated women at a rate lower than men for comparable work; and provided substantial pay increases to male classifications and smaller or no increases to traditionally female classifications. Id. at 1103-04.

Here, unlike the plaintiffs in Farmer, Copeland does not argue that the collective bargaining agreement had a discriminatory impact. Rather, he argues that the union maintained a policy of indifference to the employment rights of its minority members.[1] A union, however, has "no affirmative

---

[1] Presumably Copeland is referring to the union's failure to include a non-discrimination clause in the collective bargaining agreement.

16

(3:02CV7240)

duty to remedy discrimination by the employer." Goodman, 482 U.S. at 689 (Powell, J., dissenting). Furthermore, union members are not left without a remedy if the union does not seek to include an anti-discrimination clause in the collective bargaining agreement because they still may file Title VII actions directly against the employer. Id. (citing Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974)). Thus, the mere indifference Copeland asserts that IBEW had for the employment rights of its minority members is not sufficient to establish a claim of discrimination based on unfair representation in the collective bargaining process. Indeed, "inaction, unless invidious, is not discrimination in any accepted sense of the term." Pipefitters, 334 F.3d at 660. Thus, IBEW's purported indifference in the collective bargaining process does not establish discrimination.

Copeland also argues that IBEW discriminated against him through unfair representation by including and operating the JIT program. JIT's are non-union workers organized into the union under the Comet Program. They do not receive work assignments through the same referral process as union members, rather they are assigned to positions by the Business Manager (a union official). Ordinarily under the CBA, non-union members and union members with less seniority will be laid off from a job before union members with greater seniority. On October 27, 2000, however, Copeland was laid off by Brint Electric, but JIT's remained even though they had less seniority. According to Copeland, no African-Americans have ever been organized into the union through the JIT program. He contends that, as a result, the JIT program adversely impacts African-Americans.

An "[a]dverse impact involves the existence of an employment practice which, although neutral on its face, has the effect of disproportionately affecting persons in a legally protected group." O'Hara

17

(3:02CV7240)

v. Mt. Vernon Bd. of Educ., 16 F. Supp. 2d 868, 886 (S.D. Ohio 1998) (citing Griggs v. Duke Power Co., 401 U.S. 424 (1971)). "Adverse impact means that there is a substantially different rate of selection, hiring, promotion or other employment decisions which works to the disadvantage of members of a race, sex, or ethnic group." Zamlen v. City of Cleveland, 686 F. Supp. 631, 652 (N.D. Ohio 1988). To establish a prima facie case of adverse impact, a plaintiff must "(1) . . . identif[y] a specific employment practice to be challenged; and (2) through relevant statistical analysis prove[] that the challenged practice has an adverse impact on a protected group." O'Hara, 16 F. Supp. 2d at 886, fn. 17 (citing Scales v. J.C. Bradford & Co., 925 F.2d 901, 907-08 (6th Cir.1991)). In other words, after identifying the employment practice, a plaintiff must offer "statistical evidence of a kind and degree sufficient to show that the practice in question has caused prohibited discrimination." Id. at 887 (citing Abbott v. Fed. Forge, Inc., 912 F.2d 867, 872 (6th Cir. 1990)).

  Here, Copeland has not offered statistical evidence suggesting that the JIT program has an adverse impact on African-American employment. He only presents the fact that no African-Americans have been organized under the JIT program. This purported fact has virtually no probative value for an adverse impact claim. Copeland presents no statistical evidence that a significant number of African-Americans or other minorities were laid off in favor of JIT's. Furthermore, he presents no statistical evidence that the layoffs resulted in a significant alteration in the racial composition of IBEW members who are employed or obtain employment. Thus, Copeland has failed to present sufficient statistical evidence to establish a prima facie case of adverse impact discrimination. Consequently, his claim that IBEW failed to fairly represent him and other minorities fails. IBEW, therefore, is entitled to

18

(3:02CV7240)

summary judgment on Copeland's claim of discrimination through unfair representation in the bargaining process.

## VI. MOTION FOR ATTORNEY FEES

IBEW also seeks attorney fees in its motion for summary judgment. A district court may award a prevailing Title VII defendant attorney fees in three instances: (1) the claim was "frivolous, unreasonable, or without foundation;" (2) the plaintiff continued to litigate the claim after it clearly became groundless; or (3) the claim was brought in bad faith. See Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 419-22 (1978); Gettings v. Building Laborers Local 310 Fringe Benefits Fund, 349 F.3d 300, 309-10 (6th Cir. 2003). A court must not engage in post hoc reasoning but rather must determine whether the suit was groundless at the outset or whether the plaintiff continued to litigate the suit after it clearly became groundless. Christiansburg Garment Co., 434 U.S. at 421-22; Wislon Simmons v. Lake County Sheriff's Dep't, 207 F.3d 818, 823 (6th Cir. 2000). In Title VII cases, attorney fees should be awarded to defense counsel only in "the most egregious circumstances." Gettings, 349 F.3d at 310. In Gettings, the Court held that such egregious circumstances may well have been present there because the EEOC declined to even investigate the plaintiff's claim because the defendant was not subject to Title VII. Id.

Here, unlike Gettings, the EEOC had issued a determination letter finding that IBEW had discriminated against Copeland by acquiescing in and failing to oppose Retzke/Snyder's purported discrimination of him. IBEW points to no evidence which indicates that Copeland should have become aware that this conclusion was erroneous. Thus Copeland was entitled to rely on the EEOC's

19

(3:02CV7240)

conclusion that his claim had merit. This Court, therefore, cannot conclude that Copeland's claim was frivolous, that it clearly became so, or that Copeland brought the claim in bad faith.

IBEW further contends that Copeland's claim was made in bad faith because he knew that it had not refused to process his discrimination grievances because, after the EEOC determination letter, it had attempted to pursue them as violations of the CBA. While IBEW did process Copeland's grievances, it did not do so as discrimination grievances but rather converted them to violations of the CBA. Thus, to the extent that Copeland believed IBEW had to process discrimination grievances, his claims do not provide evidence bad faith. IBEW also contends that Copeland's seeking millions of dollars in damages when he settled his claim against Retzke/Snyder for only $5,500 exhibits his bad faith. Copeland, however, styled this matter as a class action, and therefore, his settlement with Retzke/Snyder standing alone does not establish that the damages he sought were in bad faith. Consequently, the Court cannot conclude that Copeland acted in bad faith. IBEW's Motion for Attorney Fees, therefore, is DENIED.

## VI. CONCLUSION

For the foregoing reasons, Defendant IBEW, Local No. 8's Motion for Summary Judgment (Doc. No. 55) is GRANTED, and its Motion for Attorney Fees is DENIED.

IT IS SO ORDERED.

| | |
|---|---|
| June 6, 2005 | /s/ David D. Dowd, Jr. |
| Date | David D. Dowd, Jr. |
| | U.S. District Judge |